Kyra I. Nelson
65 Lovers Lane
Groton, MA 01450
kyra.nelson5@gmail.com
(617) 821-2341

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS (WORESTER)

|  |  |
|---|---|
| In re:<br><br>KYRA I, NELSON,<br><br>Debtor, | Chapter 13<br>Case # 24-41202<br><br>**ANSWER TO WELLS FARGO BANK, N.A.'S Reply TO DEBTOR'S RESPONSE TO OBJECTION TO CHAPTER 13 PLAN** |

**ANSWER TO WELLS FARGO BANK, N.A.'S OBJECTION TO CHAPTER 13 PLAN**

### INTRODUCTION

COMES NOW Plaintiff KYRA NELSON and files this ANSWER TO WELLS FARGO BANK, N.A.'S OBJECTION TO CHAPTER 13 PLAN:

**ANSWER TO THE REPLY OF WELLS FARGO BANK, N.A.**

Claims for Equitable relief are not available under the law where relief is enforceable and strictly construed by statute. There is no such thing as an 'EQUITABLE or COMMON LAW LIEN" on real property in the state of MA In the State of Massachusetts, lien law is to be strictly construed pursuant to the legislature. This "creature of statute" can be enforced only pursuant to the statutes, and never enforceable by mere argument or claims of equitable relief.

1

Even a holder of a discharged obligation does not have a claim for relief by virtue of being a note holder, as the remedy of lien enforcement no longer exists for that holder.

The trustee has no legal remedy for the request from Wells Fargo, NA, against Debtor to its Proof of Claim. In re Benton USBC, D. MA.563 B.R. 113 2017 WL 53581 2017, Case No. 16–11385–JNF, Adv. P. No. 16–1101. The request from Wells Fargo, NA, who is a noncreditor of Debtor pursuant to § 544( 544(a)(3) grants a trustee in bankruptcy the power to avoid a lien to the same extent the lien would be unenforceable against a bona fide purchaser for value under applicable non-bankruptcy law—See also Baldiga v. Golemo (In re Golemo), 494 B.R. 588, 592 (Bankr. D. Mass. 2013), while §a)(3) liberally grants the Trustee bona fide purchaser status "without regard to any knowledge". Iit does not 'give the trustee any greater rights than he, or any person, would have as a bona fide purchaser or lien creditor under applicable state law.'

**When the property was purchased for value, there was no lis pendens, there was no perfected lien from Wells Fargo, NA creating a material defect under Massachusetts law that Wells Fargo failed to provide the bona fide purchaser with constructive notice of the bankruptcy lawsuit or the imaginary unperfected lien.** Any claim referring to or suggesting a right to Wells Fargo, NA having a court order, which does not exist and a court order has never existed, explicitly regarding a modified lien or right to property as a Mortgage in favor of Wells Fargo, there is no destroying the rights of Plaintiff as a

bona fide purchaser for value. Wells Fargo's right does not and has never existed

pursuant to the

statutory laws of MA.

Further, a lien of a purported creditor can never, in reverse, create a Debt

or a note, or any obligation to pay a debt. It is well established state law that a

transfer of a lien without an accompanying transfer of the debt creates no right of

enforcement to the transferee. Under Massachusetts law, Wells Fargo had to

provide constructive notice of its perfected mortgage lien or lawsuits to the bona

fide purchaser, and for that reason, there is no lien and the current trustee is

entitled to avoid a Wells Fargo mortgage in exercise of his strong-arm powers. <u>11</u>

<u>U.S.C.A. § 544(a)(3)</u>.

**Debtor acquired the property pursuant to M.G.L.A. 183 § 1, requiring**

**no acts other than the delivery of the Deed by a person entitled to convey**

**the land. Pursuant to M.G.L.A. 183 § 4 the property was sold and that sales**

**transfer Deed alienated all attachment to the real property (the land) from**

**the previous owner.** M.G.L.A. 183 § 10 states the conveyance by "Warranty

Deed" has the force and effect of a deed in fee simple to the grantee that the

previous owner had a right to sell the property and no claims against the previous

owner transferred that were not recorded at the time of the sale.

Pursuant to M.G.L.A. 183 § 21 "Statutory power of sale" in mortgage, but

upon any default in the performance of the payment of the note, would be the

only allowance of a sale – and in this case, there is no obligation to pay the debt.

Massachusetts law requires that the pre-foreclosure default and acceleration

notice given to the mortgagor be accurate and not deceptive. Debtor is not the mortgagor. Under Massachusetts law, if a mortgagee has provided the required notices of default, and the mortgagor has failed to cure the default, there would be valid notice, however, the Debtor in the bankruptcy is not the mortgagor. The mortgagee is authorized to foreclose pursuant to the statutory power of sale only against the mortgagor, and the Debtor is not the mortgagor. Pursuant to 1, 25 of this chapter, and c. 244, §§ under this section and § 14, 18, a "mortgage" is regarded between the mortgagor and mortgagee as a conveyance in fee, **but for all intents and purposes it is security for a debt**, not an estate. Therefore, Wells Fargo has no standing as a creditor in Debtor's bankruptcy at this or any time when Debtor has no note and no mortgage originated by the current Debtor.

It is well established state law that mortgages and debts/notes are not attached to each other and do not "travel together." In this exact case, the referenced debt was completely discharged in 2012 and no longer exists as an obligation of any Debtor. **The protection of the Bankruptcy Discharge Injunction § 524(a)(2) prevents this debt from appearing in any other bankruptcy for the life of the debt. In October of 2012, bankruptcy was discharged.**

**Wells Fargo admits that it has no relationship with Debtor.** The record is clear that Wells Fargo, NA filed no proof of claim in the Chapter 7 bankruptcy of Brad Nelson. **Without the Trustee of the Chapter 7 bankruptcy acknowledging a perfected lien by Wells Fargo, NA and without adding**

**Wells Fargo, NA as a creditor to the Chapter 7 bankruptcy, there is no legal "ride-through" of any lien to be enforced by Wells Fargo today.** The record is clear that Wells Fargo does not now and never has had a required perfected statutory lien at any time regarding the real property at issue herein. There is no prepetition debt owed to Wells Fargo in Debtor's current bankruptcy. There is no case holding that Wells Fargo has ever had a debt interest in the property (or a lien) and has no legal path to establish a Debt Obligation in Debtor's Chapter 13 case. The only one claiming this is Wells Fargo though its counsels' mere argument. Without the "ride-through" of a Chapter 7 lien, there is no lawful *in rem* claim attributed to Wells Fargo, NA nor is there any basis to have ever made an *in rem* claim.

After the debt was declared fully discharged and of no obligation by the bankruptcy court and the bankruptcy discharge Injunction was already in place, § 524(a)(2) which prevents this debt from appearing in any other court or addressing the need to make any payment obligation of any kind for the life of the loan, in paragraph 9, counsel for Wells Fargo carefully crafts argument that dicta, without any court rulings, would provide a "new" ruling and a basis to assert its proof of claim.

The actual ruling by the Court was merely to disallow an evidentiary hearing, and nothing more was stated in the ruling. **As a matter of law, the elimination of the obligation to pay would never be resurrected by a merger of banks, the debt is still uncollectible, and was uncollectible at the time of the request for the evidentiary hearing. The Trustee in Chapter 7**

**bankruptcy did not recognize Wells Fargo as a creditor (as no Proof of
Claim was filed) and did not extend the "ride-through" lien allowance to
Wells Fargo, NA by lawfully returning the property directly to Debtor
without modification of either liens or debt in favor of Wells Fargo, NA.**
Debtor had no reason to believe that Wells Fargo would not be honest with the
court that it had no "ride-through" rights of ownership of either the debt or the
lien, even though Wells Fargo dishonestly made a claim otherwise.  Further, the
debt was already discharged, and Wells Fargo's claim was void even if the court
did not recognize that it was void at the time.

The dicta referenced by Wells Fargo, NA in paragraph 9 was based on
incomplete documentation from the Office of the Comptroller of the Currency
(OCC) and incomplete records of the Federal Deposit Insurance Corporation
(FDIC) that detailed that no assets were provided from Wachovia Mortgage's
branch office, that branch sold all of their assets in that branch before the branch
had a merger, and also records did not identify any underlying Lender's assets
as being merged with or into Wells Fargo.

Upon a closer scrutiny of the records from the OCC and the FDIC, it has
become clear that Lender, World Savings Bank out of Texas, never merged, sold
assets to or had any financial relationship to Wells Fargo Bank, N.A. in Sioux
Falls, SD.  Any and all inferences put forth by Wells Fargo can only be viewed as
a fraud on the court and void by operation of law as stated in the  *D'Oench
Doctrine of Common Law Estopple,* 315 U.S. 447 (1942).  This becomes crystal

clear as Wells Fargo is incapable of producing any financial records between World Savings out of Texas and itself.

The impact of the *D'Oench Doctrine* in this case is that any decisions of a court of law, appellate or otherwise, is void if it conflicts with the records of a federal regulator, like the OCC or the FDIC. In this case, the records of the OCC and the FDIC both confirm that the lender bank, World Savings Bank out of Texas never merged or sold assets to Wells Fargo Bank, N.A. The Congressional report of the merger of Wachovia never merged with World Savings Bank, and that Wachovia and Wells Fargo had NO ASSETS that were exchanged in any of the subsidiary mergers of the either companies at any time. As a catch-all phrase of "merger" does not exist, there can be no claim that the word "merger" describes the activity of all of the brick and mortar building acquisitions or other forms of assets, especially when all of Wachovia mergers were required to perform mergers pursuant to the Bulk Sales Act of North Carolina, the corporate headquarters location.

As such, no response can be legally made without an evidentiary hearing, which, to date, has never been done and has mysteriously never been allowed to be presented to date. Again, the only actual ruling of the Appellate Court was its agreement that no evidentiary hearing would be held by the bankruptcy court. The Court indicated that Mr. Nelson's attorney did not make any arguments on his behalf and Mr. Nelson, being represented by counsel, was unable to stand and make the arguments when the attorney failed to show up for the hearings.

It should be made clear that there has never been an evidentiary hearing for the claim relating to the claim of Wells Fargo; however, the record is clear that Wells Fargo has never perfected any interest in the property, whether through assertion of an expired debt or through a lien.

Dated January 28, 2025

Respectfully submitted:

/s/ *Kyra I. Nelson*
Kyra I. Nelson
65 Lovers Lane
Groton, MA 01450
kyra.nelson5@gmail.com
(617) 821-2341

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| In Re: | ) | Case Number 24-41202-EDK |
| Kyra Isabel Nelson | ) | Chapter 13 |
| | ) | |

### CERTIFICATE OF SERVICE

I, Kyra I. Nelson, hereby certify that on January 28, 2025, I electronically filed the foregoing hereby certify that on January 28 2025 I electronically filed the foregoing *Answer to the Reply to Debtor's Response to Objection to Debtor's Chapter 13 Plan* with the United States Bankruptcy Court for the District of Massachusetts using the CM/ECF System. I served the forgoing documents on the following participants through the pro se filing system.

Richard King, Assistant U.S. Trustee
David Mawhinney, Trustee

I certify that I have mailed by first class mail, postage prepaid the documents electronically filed with the Court on January 28, 2025.

Marcus E. Pratt, Esquire
BBO #684610
Korde & Associates, P.C.
900 Chelmsford Street, Suite 3102
Lowell, MA 01851
Tel: (978) 256-1500
bankruptcy@kordeassociates.com

/s/ *Krya I. Nelson*
Kyra I. Nelson
65 Lovers Lane
Groton, MA 01450
kyra.nelson5@gmail.com
(617) 821-2341

9

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS (Worcester)

| | |
|---|---|
| In Re: | Case Number 24-41202-EDK |
| Kyra Isabel Nelson | Chapter 13 |

## MOTION OF WELLS FARGO BANK, N.A. AND/OR ITS SUCCESSORS AND ASSIGNS FOR ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND FOR *IN REM* RELIEF

Now comes Wells Fargo Bank, N.A. and/or its successors and assigns (hereinafter referred to as "Wells Fargo") and hereby moves this Honorable Court pursuant to Section 362(d) of the United States Bankruptcy Code (the "Code"), to the extent applicable, for Relief from the Automatic Stay so as to permit Wells Fargo to enforce any and all applicable rights and remedies against Kyra Isabel Nelson (a/k/a Kyra I. Nelson; hereinafter referred to as the "Debtor" or "Ms. Nelson"), including but not limited to a foreclosure sale on certain mortgaged property which is located at *65 Lovers Lane, Groton, MA 01450* (the "Property"). In addition, in light of the extraordinary circumstances of this case, Wells Fargo requests that the Court's order granting relief from the automatic stay include *in rem* relief on the Property pursuant to 11 U.S.C. § 362(d)(4).[1]

In support thereof, and in compliance with United States Bankruptcy Court, District of Massachusetts Local Rule 4001-1, Wells Fargo states as follows:

1.   This is a proceeding for relief from the automatic stay pursuant to 11 U.S.C. § 362(c) and § 362(d), and Fed. R. Bankr. P. 4001.

2.   The Debtor is the current owner of a certain parcel of real estate known and numbered as *65 Lovers Lane, Groton, MA 01450* (the "Property"). The Property is encumbered by a first mortgage given by Bradley R. Nelson (hereinafter referred to as "Mr. Nelson") to World Savings Bank, FSB (the "Mortgage"). The Mortgage is dated March 2, 2007 and is recorded with the Middlesex County (Southern District) Registry of Deeds in Book 49111, Page 205.

3.   The Mortgage is now in default by reason of failure of payment of principal, interest, and late fees. A copy of the Mortgage is attached hereto and is marked <u>Exhibit A</u>.

---

[1] Due to the nature of the relief requested and the exigent circumstances of this particular case, Wells Fargo contends that a pre-filing conference per MLBR 13-16-1 (a)(5) is not necessary and Local Form 13 per MLBR13-16-1 (d) is not required as an attachment to this Motion.

4.    The Mortgage secures a promissory note given by Bradley R. Nelson to World Savings Bank, FSB in the original principal amount of $511,500.00 (the "Note"). Wells Fargo and/or its custodian and/or agent is, as of the date hereof, in possession of the Note. Wells Fargo is an entity entitled to enforce the Note. A copy of the Note is attached hereto and is marked <u>Exhibit B</u>.

5.    As stated above, the Mortgage was originally given to World Savings Bank, FSB. Wells Fargo is a successor in interest to World Savings Bank, FSB as the originating lender. Copies of the applicable name change/merger documents evidencing same are attached hereto as <u>Exhibit C</u>. Consequently, the Mortgage has not been assigned of record. Wells Fargo Bank, N.A. is also the current servicer for this loan.

6.    The Debtor holds an interest in the Property by virtue of the Warranty Deed from Bradley R. Nelson to Kyra I. Nelson recorded on December 26, 2023 with the Middlesex County (Southern District) Registry of Deeds in Book 82344, Page 531. Mr. Nelson is the Debtor's father.

7.    The Debtor's Chapter 13 Petition was filed on November 21, 2024.

8.    Wells Fargo filed a timely Proof of Claim in this case on January 17, 2025 [Claim No. 3-1] setting forth a pre-petition arrearage claim of $442,325.06.

9.    On or about December 6, 2024, the Debtor filed a Chapter 13 Plan [Doc. No. 14]. The Debtor's Plan does not propose to cure Wells Fargo's pre-petition arrears, nor does it provide for the maintenance of post-petition mortgage payments directly to Wells Fargo as such payments come due during the pendency of this Chapter 13 case. In fact, the proposed Plan makes no reference to the Property and/or Wells Fargo's claim.[2]

10.    The Property is subject to the following encumbrances:

| Lien Holder | Type of Lien | Amount Owed | Priority |
|---|---|---|---|
| Wells Fargo | 1st Mortgage | $752,787.72 | n/a |
| Wells Fargo Bank, N.A. | Junior Mortgage/ HELOC | *Max. Principal Amount of $102,300.00; *see* Middlesex South Deeds 49111/219) | No |

---

[2] While Wells Fargo acknowledges that the Debtor is/was not a party to the Mortgage or Note and is not obligated to make payments pursuant to same, Wells Fargo asserts that the Debtor has no basis for proposing a Plan which fails to provide for any treatment of Wells Fargo's claim in light of her current ownership of the Property (which is part of her bankruptcy estate and is subject to the contractual terms and conditions of the Mortgage and its related documents).

| Kyra I. Nelson | Junior Mortgage | $499,000.00 (*Original Principal Balance; *see* Middlesex South Deeds 82344/534) | No |
|---|---|---|---|
| MA Dept. of Revenue | Tax Lien | $7,446.56 (*see* Middlesex South Deeds 80541/523) | No |
| MA Dept. of Revenue | Tax Lien | $11,932.18 (*see* Middlesex South Deeds 78668/35) | No |
| MA Dept. of Revenue | Tax Lien | $3,406.51 (*see* Middlesex South Deeds 82425/536) | No |

**Total: $1,274,572.97***

*\*Does not include amount owed on Junior Mortgage/ HELOC.*

11. There is no other collateral securing the obligation to Wells Fargo.

12. A Declaration of Homestead has been recorded with respect to the Property by the Debtor.  Said Homestead was recorded on May 21, 2024 with the Middlesex County (Southern District) Registry of Deeds in Book 82791, Page 82.

13. According to the Tax Assessor's Database for the Town of Groton, MA, the approximate fair market value of the Property is $754,000.00.  Accordingly, for purposes of this Motion only, it is Wells Fargo's opinion that the liquidation value of the premises is $704,821.76 calculated as the fair market value less a reasonable realtor's fee (6%); deed stamps ($3,438.24); and anticipated closing costs incurred for a real estate closing ($500.00).

14. As of January 23, 2025, the amount owed on the Mortgage is approximately $752,787.72 including principal, interest, late fees, and attorney fees and costs.  The ongoing monthly mortgage payment is currently $3,467.06 (effective December 1, 2024; inclusive of a required escrow contribution, which is otherwise subject to periodic adjustment), and the subject mortgage account is now significantly in arrears. Contractual mortgage payments are presently due for ***September 1, 2012*** through and including January 1, 2025.[3]  It is anticipated that as of the date of the hearing on this Motion no further payments will be made.

---

[3] As of the date of this Motion, Wells Fargo has incurred approximately $1,050.00 in attorney fees and $199.00 in attorney costs in connection with this Motion.  This amount will increase if counsel for Wells Fargo performs additional services for Wells Fargo in connection with this Motion.

15.  While the instant Chapter 13 Petition is the first such bankruptcy petition filed by the Debtor, Kyra
     Isabel Nelson, there have been two (2) prior bankruptcy petitions filed by Bradley R. Nelson (the
     Debtor's father and obligor on the mortgage loan(s) held by Wells Fargo), and for more than a
     decade, both the Debtor and Mr. Nelson have filed numerous challenges to Wells Fargo's two (2)
     mortgages on the Property in various state and federal courts in an effort to prevent Wells Fargo
     from exercising its legitimate right to foreclose on the Property due to the extreme default on both
     mortgages.  All of such challenges have been rejected by the multiple courts that have heard them,
     and Mr. Nelson's transfer of his ownership interest in the Property to Ms. Nelson and Ms.
     Nelson's subsequent filing of the instant Petition constitute yet another misguided and improper
     attempt to interfere with Wells Fargo's foreclosure of the Property.

16.  Relative to the filings of the Debtor and Mr. Nelson as referenced above, Wells Fargo notes
     relevant facts as follows:

     a.  On July 26, 2012, Mr. Nelson filed a Chapter 7 Petition with the Eastern Division of the
         Bankruptcy Court for the District of Massachusetts (Boston) (Case No. 12-16220-JNF).
         On his bankruptcy schedules, sworn under penalty of perjury, Mr. Nelson identified
         Wells Fargo as his creditor for both the instant mortgage (as well as a second mortgage)
         on the Property and did not contest Wells Fargo's ownership on his Schedules.  During
         this case, Wells Fargo moved for, and was granted, relief from the automatic stay to
         foreclose on the Property [*see* Doc. No. 83].  The Court later granted Mr. Nelson a
         Chapter 7 discharge [*see* Doc. No. 29].

     b.  On September 4, 2014, Mr. Nelson filed a lawsuit against Wells Fargo and World
         Savings Bank, FSB (hereinafter, "WSB") in Middlesex Superior Court (<u>Nelson v. Wells
         Fargo Bank</u>, No. 1481CV07270), which was removed to the United States District
         Court, No. 1:14-cv-14087-DJC (D. Mass. 2017).  Mr. Nelson sought damages and
         injunctive relief to stop the foreclosure and challenged Wells Fargo's standing to
         foreclose.  In Count IV for declaratory judgment, Mr. Nelson claimed that WSB did not
         hold his note, was not entitled to foreclose on the subject mortgage, and sought
         declaration of his rights.  In Count I, he claimed that Wells Fargo and WSB had "no
         legal right" to foreclose. Wells Fargo defended against Mr. Nelson's claims by arguing
         that WSB's rights in the mortgage(s) transferred by operation of law to Wachovia (as
         successor) and then to Wells Fargo without the need for any endorsements or
         assignments.  Wells Fargo filed a motion to dismiss on that and other grounds.  At oral
         argument, Mr. Nelson, who was represented by counsel, stated that he would only press

Counts III and V of his complaint.  As a result, the District Court dismissed Mr.
Nelson's other counts including the declaratory judgment claim.  The District Court later
granted Wells Fargo summary judgment on the remaining claims.  Mr. Nelson did not
appeal the District Court judgment.

c.   On May 10, 2019, Mr. Nelson filed a Chapter 13 Petition with this Court (Case No. 19-
40773-CJP).  Mr. Nelson again challenged Wells Fargo's right to enforce its
mortgage(s). Notably, he challenged Wells Fargo's ownership of his loan(s) in
objections to Wells Fargo's proofs of claims and argued that Wells Fargo was barred
from collecting Mr. Nelson's debts because of the discharge that he received in 2012 in
Case No. 12-16220-JNF.  The Court rejected Mr. Nelson's arguments, granted Wells
Fargo relief from stay to foreclose, ruled that Wells Fargo was entitled to enforce its *in
rem* Property rights, and overruled Mr. Nelson's proof of claim objections [*see* Doc.
Nos. 93, 94, and 100].  Subsequently, the BAP affirmed the Bankruptcy Court's rulings
[*see* Doc. Nos. 219, 220, and 221].

d.   On June 30, 2023, Mr. Nelson filed another complaint in Middlesex Superior Court
seeking declaratory judgment, equitable relief, and damages (Nelson v. World Savings
Bank, No. 2381CV01919).  Mr. Nelson challenged Wells Fargo's authority to enforce
the subject loan(s) and requested the release of the said obligations (and mortgages) as
"time-barred debts."  The Middlesex Superior Court granted Wells Fargo's motion to
dismiss with prejudice and entered judgment in Wells Fargo's favor.  The Court held
that Mr. Nelson's claims were barred by *res judicata*.  As of the filing of this Motion,
Mr. Nelson's appeal is pending.  *See* No. 2024-P-0888 (Mass. App. Ct. Aug. 5, 2024).

e.   On August 28, 2024, the Debtor filed her first Complaint in Worcester Superior Court
(Nelson v. Wells Fargo Bank, No. 2485CV01000).  On September 25, 2024, the
Worcester Superior Court denied Ms. Nelson's request for injunctive relief and warned
Ms. Nelson of her obligation to follow the ethical rules or face sanctions.  Wells Fargo
served a motion to dismiss, but Ms. Nelson filed a voluntary dismissal under Rule
41(a)(1)(i).

f.   With the foreclosure sale rescheduled for November 22, 2024, Ms. Nelson filed another
complaint in Middlesex Superior Court on November 14, 2024 (Nelson v. Wells Fargo
Bank, No. 2481CV03000) seeking the same injunctive relief that the Worcester Superior
Court had already denied.  Wells Fargo opposed the injunction.  On November 19, 2024,

after hearing, the Middlesex Superior Court denied the request for an injunction for "failure to establish a reasonable likelihood of success on the merits."

g.   On November 21, 2024, the Debtor filed the instant Chapter 13 Petition with this Court (Case No. 24-41202-EDK).  The foreclosure sale scheduled for November 22, 2024 was canceled as a result of this filing.

*Copies of all relevant orders referenced in subparagraphs (a) through (g) above are attached to the Reply of Wells Fargo to the Debtor's Response to its Objection to Plan filed on January 24, 2025 [Doc. No. 28] and may be further provided upon request.*

17.   Wells Fargo brings this Motion for cause under 11 U.S.C. § 362 given that, among other things, the subject mortgage loan is considerably delinquent, there is no equity in the Property, and any protection Wells Fargo may have by virtue of its interest in the collateral is quickly eroding.  In addition, Wells Fargo contends that the Property is not necessary to an effective reorganization of this Debtor, nor have any pleadings been filed in the present case to demonstrate how the Property is necessary to an effective reorganization and restructuring of the debt. (Notably, the responsive pleadings filed by the Debtor as to Wells Fargo's Objection to the proposed Plan filed on December 19, 2024 [Doc. No. 19] at Doc. Nos. 24 and 25 are simply re-stylized documents setting forth arguments previously litigated in the state court actions referenced above.) Accordingly, Wells Fargo requests that this Court grant relief from the automatic stay as applicable, so that it may proceed with its applicable rights and remedies including, but not limited to, a foreclosure sale on the premises and an eviction proceeding should Wells Fargo and/or its successor in interest become the successful bidder at a foreclosure sale.

18.   In addition, to the extent a co-debtor automatic stay is in place, Wells Fargo requests that this Court grant Wells Fargo relief from the automatic stay pursuant to 11 U.S.C. § 1301(c) as to mortgagor, Bradley R. Nelson.  As grounds, Wells Fargo states that (1) Bradley R. Nelson received at least a portion of the consideration for the Mortgage; (2) Bradley R. Nelson has failed to cure the arrearage set forth above; (3) Wells Fargo would suffer irreparable harm if the automatic stay remains in place as to Bradley R. Nelson given that, as set forth above, any protection Wells Fargo may have is eroding and the Mortgage has substantial arrearage; and (4) Bradley R. Nelson has been served with a copy of this Motion and therefore has the opportunity to respond.

19.   Furthermore, the conduct of the Debtor and Mr. Nelson in not only transferring the ownership
      interest in the subject collateral without the consent of Wells Fargo (as evidenced by the Warranty
      Deed recorded with the Middlesex County (Southern District) Registry of Deeds in Book 82344,
      Page 531), but in filing multiple frivolous and bad-faith actions against Wells Fargo in various
      forums (including the Bankruptcy Court) in an attempt to avoid scheduled foreclosure sales and
      thwart Wells Fargo from exercising its state law rights and remedies as to the Property, warrants
      relief beyond ordinary relief from stay or dismissal of this case.   The Debtor filed this Petition on
      the eve of a scheduled foreclosure sale, after failing to obtain an injunction in state court to stop
      said sale, and her proposed Chapter 13 Plan provides for no treatment of either of Wells Fargo's
      mortgages on the Property.   The conduct of the Debtor and Mr. Nelson is indicative of the type of
      individual that Congress intended to penalize when it passed 11 U.S.C. § 362(d)(4)(A) and (B).
      The Debtor and Mr. Nelson continue to misuse the legal and court systems and neither the
      Debtor's current bankruptcy filing nor Mr. Nelson's prior bankruptcy filings have been good faith
      attempts to restructure or repay any debt—as evidenced by the extensive history of non-payment
      on the subject mortgage account and the repeated lawsuits filed by the Debtor and Mr. Nelson in
      an effort to challenge Wells Fargo's mortgages and standing to foreclose, none of which have been
      successful.   As noted above, as of the date of filing of the instant case by the Debtor, the subject
      mortgage loan remains contractually due for the ***September 1, 2012*** payment.   The purported
      transfer of ownership of the Property in 2023 and the instant bankruptcy petition are nothing more
      than the latest chapter(s) in a prolonged delay tactic to prevent Wells Fargo the legitimate exercise
      of its right to foreclose on the Property.

20.   Wells Fargo maintains that it is entitled to *in rem* relief because, as set forth in detail above, the
      filing of this case "was part of a scheme to delay, hinder, and defraud" that involved the filing of
      multiple state court actions and bankruptcy cases.   *See* 11 U.S.C. § 362(d)(4).   This pattern of
      behavior, including the filing of meritless lawsuits and bankruptcy petitions with no possibility of
      proposing a feasible or confirmable Plan, or intent to otherwise propose one, has perpetrated fraud
      against Wells Fargo resulting in it not being able to exercise its contractual rights.

21.   Accordingly, Wells Fargo respectfully requests that this Court grant it relief from the automatic
      stay and that such order include *in rem* relief.   This will prevent the Debtor and Mr. Nelson from
      taking unfair advantage of the automatic stay to prevent Wells Fargo from proceeding with
      foreclosure of the Property now, and in future filings.

**WHEREFORE**, Wells Fargo requests that the Court:

(1) Grant Wells Fargo relief from the 11 U.S.C. § 362 automatic stay and the 11 U.S.C. § 1301 co-debtor stay (as applicable) for the purpose of exercising its various non-bankruptcy rights and remedies including and without limitation:

    i. Taking possession of the Property, obtaining a deed-in-lieu of foreclosure and/or foreclosing the Mortgage at issue; and

    ii. Taking such action as may be necessary to evict the Debtor(s) and/or any occupant from the Property;

(2) That the Order granting relief from the automatic stay include *in rem* relief with respect to the Premises, pursuant to Section 362(d)(4) of the Code, so that the Premises is excluded from the bankruptcy estate of any future bankruptcy filing purporting to affect the Premises which is filed in the next two (2) years;

(3) Waive the fourteen (14) day stay of relief pursuant to Federal Bankruptcy Rule 4001(a)(3); and/or

(4) Order such further relief as this Court deems just and proper.

In accordance with Local Rules, Wells Fargo requests that this Motion be allowed without a hearing unless an objection is timely filed.

Date:  January 29, 2025          Respectfully submitted,

                                    Wells Fargo Bank, N.A.
                                    By Its Attorney,

                                    /s/ Marcus E. Pratt
                                    Marcus E. Pratt, Esquire
                                    BBO #684610
                                    Korde & Associates, P.C.
                                    900 Chelmsford Street, Suite 3102
                                    Lowell, MA 01851
                                    Tel: (978) 256-1500
                                    bankruptcy@kordeassociates.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS (Worcester)

| In Re:<br>Kyra Isabel Nelson | Case Number 24-41202-EDK<br>Chapter 13 |
| --- | --- |

### ORDER ON THE MOTION OF WELLS FARGO BANK, N.A. AND/OR ITS SUCCESSORS AND ASSIGNS FOR ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND FOR *IN REM* RELIEF

At Worcester in said District, on the _____ day of _____, 2025, on the Motion of Wells Fargo Bank, N.A. and/or its successors and assigns ("Wells Fargo") after notice to all parties on the Wells Fargo's Certificate of Service, it is hereby

ORDERED AND DECREED:

1. Wells Fargo is granted Relief from the Automatic Stay imposed pursuant to 11 U.S.C. § 362 (and the 11 U.S.C. § 1301 Co-Debtor Stay) on the filing of the Petition for Relief.

2. Wells Fargo and any successor in interest is permitted to proceed forward to pursue its rights and remedies under state and/or federal law, including but not limited to a foreclosure of the mortgage it holds on real estate located at *65 Lovers Lane, Groton, MA 01450*, which mortgage is dated March 2, 2007 and is recorded with the Middlesex County (Southern District) Registry of Deeds in Book 49111, Page 205. A copy of such mortgage was attached to the Motion for Relief at issue. Further, Wells Fargo is authorized to proceed with its eviction rights in accordance with applicable law with respect to such Property should Wells Fargo, or its successor in interest, become the successful bidder at a foreclosure sale.

3. Wells Fargo and/or its successors, assigns, and servicer may, at its option offer, provide and enter into a potential forbearance agreement, loan modification, refinance agreement or other loan workout/loss mitigation agreement. Wells Fargo may contact the Debtor and/or his/her/their agents via telephone or written correspondence to offer such an agreement. Any such agreement shall be non-recourse unless included in a reaffirmation agreement.

4. The Court grants *in rem* relief pursuant to 11 U.S.C. § 362(d)(4) upon the Property for such reasonable period of time following the entry of the within Order necessary to allow Wells Fargo and/or its successor in interest to complete its contractual and statutory rights, including, but not limited to foreclosure sales and/or eviction actions, such that in the event of any one or more bankruptcy filings(s) pursuant to Title 11 of the United States Code made by the Debtor and/or mortgagor, Bradley R. Nelson, the automatic stay as provided by 11 U.S.C. § 362(a) shall not be effective to prohibit Wells Fargo and/or its successor in interest from taking action against the Property.

5. The *in rem* relief upon the Property shall follow the subject premises in the event that the Debtor and/or mortgagor, Bradley R. Nelson, assigns, transfers or conveys any and all interests which he/she/they has/have in the premises during the aforementioned reasonable period of time to allow Wells Fargo and/or its successor in interest to complete the exercise of its rights as aforementioned.

_____
Honorable Judge Katz
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS (Worcester)

| In Re: | Case Number 24-41202-EDK |
|---|---|
| Kyra Isabel Nelson | Chapter 13 |

### CERTIFICATE OF SERVICE

I, Marcus Pratt, Attorney for **Wells Fargo Bank, N.A. and/or its successors and assigns** hereby certify that on January 29, 2025, I electronically filed the foregoing *Motion for Relief and Proposed Order* with the United States Bankruptcy Court for the District of MA using the CM/ECF System.  I served the forgoing documents on the following CM/ECF participants:

Richard King, Assistant U.S. Trustee
David A. Mawhinney, Trustee

I certify that I have mailed by first class mail, postage prepaid the documents electronically filed with the Court on the following non-CM/ECF participants:

Kyra Isabel Nelson
65 Lovers Lane
Groton, MA 01450

Bradley R. Nelson
65 Lovers Lane
Groton, MA 01450

Tax Collector:
Town of Groton, MA
173 Main Street
Groton, MA 01450

Massachusetts Department of Revenue
Attn: Bankruptcy Unit
P.O. Box 7090
Boston, MA 02204-7090

/s/ Marcus E. Pratt
Marcus E. Pratt, Esquire
BBO #684610
Korde & Associates, P.C.
900 Chelmsford Street, Suite 3102
Lowell, MA 01851
Tel: (978) 256-1500
bankruptcy@kordeassociates.com

RECORDING REQUESTED BY:
*WORLD SAVINGS BANK*


**WHEN RECORDED MAIL TO:**
*WORLD SAVINGS BANK*
*FINAL DOCUMENTATION*
*CLOSING DEPARTMENT*
*P.O. BOX 659548*
*SAN ANTONIO, TX 78265-9548*


**LOAN NUMBER:** ████████

**NOTE AMOUNT:** **$511,500.00**

Bk: 49111 Pg: 205   Doc: MTG
Page: 1 of 14   03/12/2007 01:10 PM

2007 000044555

FOR RECORDER'S USE ONLY

# MORTGAGE

THIS IS A FIRST MORTGAGE WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR BIWEEKLY PAYMENTS OF PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS MORTGAGE IS **$639,375.00** WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

**I.    DEFINITIONS OF WORDS USED IN THIS MORTGAGE**

**(A)    Security Instrument.** The Mortgage, which is dated **March 2, 2007** will be called the "Security Instrument."

**(B)    Borrower.** BRADLEY R NELSON, AN UNMARRIED MAN  sometimes will be called "Borrower" and sometimes simply "I" or "me."

**(C)    Lender. WORLD SAVINGS BANK, FSB,  ITS SUCCESSORS AND/OR ASSIGNEES,** will be called "Lender." Lender is **a FEDERAL SAVINGS BANK,** which is organized and exists under the laws of the United States. Lender's address is **1901 Harrison Street, Oakland, CA 94612** .

**(D)    Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$511,500.00** ("Note Amount"), plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay the debt in full by **March 26, 2037** .

**(E)    Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

**(F)    Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

**(G)    Person.** Any person, organization, governmental authority or other party will be called "Person."

SD166A (2005-04-2)
DEFERRED INTEREST

Page 1

MA



LENDER'S USE ONLY

**II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY**

I mortgage, irrevocably grant and convey the Property with Mortgage Covenants (as defined by Section 19 of the Massachusetts General Law, Chapter 183) to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(i)    pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender, any changes to the Secured Notes made with the written consent of Lender;

(ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

**III.    DESCRIPTION OF THE PROPERTY**

I give Lender rights in the Property described below:

(i)    The property which is located at **65 LOVERS LN, GROTON, MA  01450-1831**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)    All buildings and other improvements that are located on the Described Property;

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

**IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (i) I lawfully own the Property; (ii) I have the right to mortgage, grant and convey the Property to Lender; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**COVENANTS**

I promise and I agree with Lender as follows:

**1.    BORROWER'S PROMISE TO PAY**

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

SD166B (2005-04-2)

MA

Page 2

Bk: 49111 Pg: 207

**2.    PAYMENTS FOR TAXES AND INSURANCE**

   **(A)    Borrower's Obligations**

         I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

   **(B)    Escrow Accounts**

         Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

         The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all Sums Secured by this Security Instrument.

         If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

         Upon payment in full of all Sums Secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 27, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the Sums Secured by this Security Instrument.

SD166C (2005-04-2)

MA

**3.   APPLICATION OF BORROWER'S PAYMENTS**

Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;
Second, to pay any advances due to Lender under this Security Instrument;
Third, to pay the amounts due to Lender under Paragraph 2 above;
Fourth, to pay interest due under the Secured Notes;
Fifth, to pay deferred interest due under the Secured Notes;
Sixth, to pay principal due under the Secured Notes;
Last, to pay late charges due under the Secured Notes.

**4.   BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien.** I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.   BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

SD166D (2005-04-2)

MA

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 27 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any Proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those Proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

**6.    BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS**

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**7.    LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may include, without limitation, appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5 above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

**8.    LENDER'S RIGHT TO INSPECT THE PROPERTY**

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

**9.    AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY**

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

SD166E (2005-04-2)    Page 5    MA

Bk: 49111 Pg: 210



If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

**10.    CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**

**(A)    Borrower's Obligations**

Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

**(B)    Lender's Rights**

Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 27 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Secured Notes and under this Security Instrument.

**11.    OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**12.    MAXIMUM LOAN CHARGES**

If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

**13.    LEGISLATION AFFECTING LENDER'S RIGHTS**

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

SD166F (2005-04-3)

MA

**14.    NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **65 LOVERS LN, GROTON, MA  01450-1831**. A notice will be given to me at an alternative address if I give Lender a notice of my alternative address. I may designate only one mailing address at a time for notification purposes. Any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used in this Mortgage," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15.    GOVERNING LAW; SEVERABILITY**

This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions, ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located. In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

**16.    BORROWER'S COPY**

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

**17.    LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B), enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 27, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.    INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**

An **assignment** is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe to Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

SD166G (2005-04-2)

MA

Bk: 49111 Pg: 212

**19.   CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.   LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.   WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.   CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.   MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.   CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

**(A)**   If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

**(B)**   The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

**(C)**   If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a **master** or **blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such **master** or **blanket** policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master** or **blanket** policy to Lender annually.

SD166H (2005-04-2)

Page 8

MA

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

**(D)**    I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master** or **blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**25.    FUTURE ADVANCES**
At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

**26.    AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
    **Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

    **Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

    (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

    (ii)    Lender approves the creditworthiness of the transferee in writing;

    (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

    (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

    (v)    the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with Lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**27.    RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading; or (v) there occurs any breach of the Statutory Condition (as defined by Section 20 of the Massachusetts General Law, Chapter 183). If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, the Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed under the Applicable Law to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property. In addition to any other right or remedy available to Lender, if there is any Breach of Duty, including, without limitation, a breach of the Statutory Condition, Lender shall have and may exercise the Statutory Power of Sale (as defined by Section 21 of the Massachusetts General Law, Chapter 183).

The sale of the Property may be postponed by or at the direction of Lender except as limited or prohibited by the Applicable Law. If the Property is sold under the Applicable Law, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property, except to the extent that the Applicable Law limits or prohibits any such charges.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including but not limited to, attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**28.    LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**

When Lender has been paid all of the amounts secured by this Security Instrument, Lender shall release or cancel this Security Instrument.

**29.    STATEMENT OF OBLIGATION**

To the extent allowed by law, I will give Lender a fee for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

**30.    WAIVER OF REDEMPTION**

My right of redemption is waived to the extent allowed by applicable law.

**THIS SPACE INTENTIONALLY LEFT BLANK.**

SD166J (2005-04-2)                                                                                                    MA

**31.   ( X )   QUICK QUALIFYING LOAN PROGRAM**

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**32.   ( X )   OWNER OCCUPANCY**

Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

**( X )   VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**EXECUTED AS AN INSTRUMENT UNDER SEAL**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

WITNESS(ES):

_____    _____

**BORROWER(S):**

_____    (Seal)
BRADLEY R NELSON

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

_____ [Space Below This Line For Acknowledgment] _____

## COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss.

On this 2nd day of March, 2007, before me, the undersigned notary public, personally appeared
Bradley Nelson, proved to me through satisfactory evidence of identification,
which was/were [ ] Mass. driver's license(s) or [ ] _____, to be the person(s) whose
name(s) is/are signed on the preceding or attached document, and acknowledged to me that he/she/they
signed it voluntarily for its stated purpose.

_____

Notary Public John G. Molloy
My Commission Expires: 7/28/2011

MASSACHUSETTS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022 1/01  Page 17 of 16

A certain tract of land on the westerly side of Lovers Lane in Groton, Middlesex County, Massachusetts, being shown as Lot 5, containing approximately 2.03 acres, more or less, and more particularly described on a Plan of Land entitled "Land in Groton, Mass., survyed for Kevin Saaristo, Scale 1" = 100' dated June 1994" by David E. Ross Assocaites, Inc., Civil Engineers, and recorded with Middlesex South District Registry of Deeds in Book 24735, page 390.

Subject to a Declaration of Easements for fill and grading, dated October 23, 1997, and recorded with said Deeds in Book 17796, Page 330.

For our title reference see Deed 42146, Page 493.

Being the same premises conveyed to the herein named mortgagor (s) by deed recorded with Middlesex South District Registry of Deeds in Book 42146, Page 493.   .

REGISTRY OF DEEDS
SOUTHERN DISTRICT
ATTEST:

*Eugene C. Brune*

REGISTER

**WORLD SAVINGS BANK, FSB**

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

### BIWEEKLY PAYMENT

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY BIWEEKLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY BIWEEKLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: ███████        DATE: **March 2, 2007**

BORROWER(S): **BRADLEY R NELSON, AN UNMARRIED MAN** sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **65 LOVERS LN, GROTON, MA  01450-1831**

1.    **BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$511,500.00**, called "Principal", plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB,  a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

2.    **INTEREST**

   **(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **7.450%**. The interest rate may change as described in this Section 2. Interest will be charged on the basis of a 364-day year, divided into 26 segments of two weeks each.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

   **(B)   Interest Change Dates**

The interest rate I will pay may change on the **23rd** day of **April, 2007** and on every other Monday thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.



**(C)    Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**  called "Lifetime Rate Cap."

**(D)    Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an Index is substituted as described in Section 2(F) of this Note, the alternative Index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E)    Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.800** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new "Interest Rate" until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, carryover or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)    Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available.  For purposes of this Section 2(F), the Index is not "available" if:  (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note.  The selection of the alternative index shall be at Lender's sole discretion.  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

**3.    PAYMENTS**

**(A)    Time and Place of Payments**

I will pay Principal and interest by making payments every two weeks.

I will make my first biweekly payment on **April 9, 2007** and every other Monday thereafter. I will make these biweekly payments until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **MARCH 26, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will maintain a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, and keep sufficient funds in such deposit account to allow Lender to automatically withdraw my biweekly payment on each of the biweekly payment dates stated above. The sole purpose of the deposit account is to ensure payment of the biweekly payments on the due-date of each payment and I instruct and charge Lender to withdraw the amount of each biweekly payment from the deposit account on each due date without any further instructions from me.

**(B)    Amount of My Initial Biweekly Payments**

Each of my initial biweekly payments will be in the amount of U.S. $ **1,092.10**. This amount will change as described in Sections 3(C) and 3(D) below. My initial biweekly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)    Payment Change Dates**

My biweekly payment will change as required by Section 3(D) below beginning on the **7th** day of **April, 2008** and every 52 weeks thereafter.  Each of these dates is called a "Payment Change Date."  My biweekly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new biweekly payment every other Monday beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)   Calculation of Payment Changes**

Subject to Section 3(F) and 3(G), on the Payment Change Date my biweekly payment may be changed to an amount sufficient to pay the unpaid Principal balance, including any deferred interest as described in Section 3(E) below, by the "Modified Maturity Date." The Modified Maturity Date is the date on which this note will be paid after accounting for acceleration of the payment schedule resulting from biweekly payments rather than the monthly payment schedule used to calculate the Maturity Date described in Section 3(A) above. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 50 but not more than 90 days before the Payment Change Date.

**(E)   Deferred Interest; Additions to My Unpaid Principal**

From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due. If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)   Limit on My Unpaid Principal; Increased Biweekly Payment**

My unpaid Principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of Deferred Interest to my unpaid Principal balance, the Principal Balance Cap limitation would be exceeded on the date that my biweekly payment is due, I will instead pay a new biweekly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new biweekly payment which is equal to an amount that will be sufficient to repay my then unpaid Principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)   Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my biweekly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)   Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my biweekly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.   FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.   BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.**

**6.   MAXIMUM LOAN CHARGES**

If a law which applies to this loan and which sets maximum loan charges is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Lender has not received the full amount of any biweekly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **3.00 %** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each biweekly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Default - Change to Monthly Payments**

If I fail to have sufficient funds in my deposit account to make my biweekly payment on the date my biweekly payment is due on two occasions in any 12 month period or four occasions any time prior to the Maturity Date or if a garnishment, attachment or seizure is made of or against my deposit account, then I will be in default and Lender will have a right, but not a duty, to change my loan to one with payments due monthly instead of biweekly. If the Lender chooses to change my loan to one with payments due monthly, Lender will provide me with written notice of the change at least 30 days in advance of the date the first monthly payment is due. This notice will also specify the amount of the monthly payment and the date the first monthly payment is due. In such event, interest on the loan balance from the last date interest was paid to the first date of the month preceding the date the first monthly payment is due will be added to my loan balance. The amount of the first monthly payment will be determined without regard to the 7-1/2% change in amount of payment cap set forth in Section 3(D) above.

I understand that I may voluntarily change the payment mode from biweekly to monthly at any time by giving written notice to Lender at least 60 days in advance of the date on which I wish the change to take effect. If I give Lender such notice, Lender will then provide me with written notice of the amount of the monthly payment and the date the first monthly payment shall be due. I may be required to pay a processing fee and sign a Modification Agreement with Lender converting my loan to a monthly payment loan.  I understand that should the payment mode be changed from biweekly to monthly either voluntarily or due to an event of default it will not be reversible.

In the event that my payment mode is changed from biweekly to monthly, interest will be charged thereafter on the basis of a 12 month year and a 30-day month. The Interest Rate I will pay will change on the first monthly payment date and on the same day every month thereafter. This revised interest change date will be substituted for the definition of "Interest Change Date" included in Section 2(B) above. The "Payment Change Date" as defined in Section 3(C) above will change to be the date the payment is changed from a biweekly to a monthly payment as described above in this Section 7(C) and on that day every 12 months thereafter.

**(D)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(E)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full or change my loan type from biweekly to monthly at that time as described above, the Lender will still have the right to do so if I am in default at a later time.

**(F)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **66 LOVERS LN, GROTON, MA  01450-1831** or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change of my address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at  **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612**, or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.  SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice or demand on me.

<u>Exception to Acceleration of Payment of Sums Secured.</u> If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)  Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)  Lender approves the creditworthiness of the transferee in writing;

(iii)  transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)  an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)  the transferee executes an assumption agreement which is satisfactory to Lender, such assumption agreement providing for transferee opening a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, for direct payment as provided in the secured notes.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.



**12. GOVERNING LAW; SEVERABILITY**

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

**13. CLERICAL ERRORS**

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

**14. LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS**

**SIGNATURE PAGE**

**BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.**

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**EXECUTED AS AN INSTRUMENT UNDER SEAL**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

WITNESS(ES):

**BORROWER(S):**

(Seal)

BRADLEY R NELSON

WITHOUT RECOURSE
PAY TO THE ORDER OF

WELLS FARGO BANK, N.A. SUCCESSOR BY MERGER
WITH WELLS FARGO BANK SOUTHWEST, N.A. F/K/A
WACHOVIA MORTGAGE, FSB F/K/A WORLD SAVINGS
BANK, FSB

BY

GEORGIANA M SIELENI
VICE PRESIDENT LOAN DOCUMENTATION



**Office of Thrift Supervision**
Department of the Treasury

*Nicholas J. Dyer*
*Assistant Regional Director*

Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA 94014-1976
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7025 • Fax: (650) 746-7001

November 19, 2007

John A. Stoker, Esq.
Vice President and Assistant General Counsel
Wachovia Corporation
Legal Division – NC0630
One Wachovia Center
301 South Charlotte Street
Charlotte, NC 28288

Re:  World Savings Bank, FSB, Oakland, California
Notice of Amendment of Charter and Bylaws

Dear Mr. Stoker:

This is in response to your letter, dated November 8, 2007, with enclosures, which you filed with the Office of Thrift Supervision (OTS) on behalf of World Savings Bank, FSB to amend the savings bank's charter and bylaws to change its name to Wachovia Mortgage, FSB and reflect a change in the location of its home office. The new home office address is 6825 Aliante Parkway, North Las Vegas, Nevada.

The institution met the requirements of 12 C.F.R. §§ 552.4(b) and 552.5(b)(2), and the proposed amendments will be effective December 31, 2007, as set forth in the Board of Directors' resolution adopting the changes to the charter and bylaws. The filing also met the requirement of 12 C.F.R. § 545.91(b) that the savings bank notify the OTS if there is a change in the permanent address of its home office.

Please feel free to contact me at (650) 746-7025 if there are any questions.

Sincerely,

Nicholas J. Dyer
Assistant Regional Director

cc:  Robert Burns, FDIC - Atlanta



Office of the Comptroller of the Currency

Washington, DC 20219

## CERTIFICATE OF A FEDERAL SAVINGS ASSOCIATION
## TITLE CHANGE

I, Thomas J. Curry, Comptroller of the Currency, do hereby certify that, according to the records of the Office of the Comptroller of the Currency (successor to the Office of Thrift Supervision):

Effective December 31, 2007, the title of "World Savings Bank, FSB," Oakland, California (Docket No. 12642), was changed to "Wachovia Mortgage, FSB," and the home office was changed to North Las Vegas, Nevada.

IN TESTIMONY WHEREOF, today, March 3, 2017, I have hereunto subscribed my name and caused my seal of office to be affixed to these presents at the U.S. Department of the Treasury, in the City of Washington, District of Columbia.

Comptroller of the Currency





Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

## CERTIFICATE OF AUTHENTICITY

I, Thomas J. Curry, Comptroller of the Currency, do hereby certify that:

The Office of the Comptroller of the Currency, pursuant to Revised Statutes 324, et seq, as amended, and 12 USC 1, et seq, as amended, has possession, custody, and control of all records pertaining to the chartering, regulation, and supervision of all national banking associations and federal savings associations, including documents pertaining to the certification of the conversion of "Wachovia Mortgage, FSB," North Las Vegas, Nevada, to a national bank with the title of "Wells Fargo Bank Southwest, National Association," and the merger of "Wells Fargo Bank Southwest, National Association," with and into "Wells Fargo Bank, National Association," Sioux Falls, South Dakota, effective November 1, 2009.

Attached hereto is a true copy of the above described document, located in the files of the Office of the Comptroller of the Currency, Washington, D.C.

IN TESTIMONY WHEREOF, today,

January 7, 2013, I have hereunto subscribed

my name and caused my seal of office to be

affixed to these presents at the U.S.

Department of the Treasury, in the City of

Washington, District of Columbia.



_____
Comptroller of the Currency



**Comptroller of the Currency**
**Administrator of National Banks**

Large Bank Licensing

November 1, 2009

Mr. James E. Hanson
Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re:   Application to convert Wachovia Mortgage, FSB, North Las Vegas, Nevada to a national
      bank and application to merge the converted bank with and into Wells Fargo Bank,
      National Association, Sioux Falls, South Dakota
      Application Control Numbers: 2009-ML-01-0007 and 2009-ML-02-0010

Dear Mr. Hanson:

This letter is the official certification of the Comptroller of the Currency (OCC) of the
conversion of Wachovia Mortgage FSB, North Las Vegas, Nevada to a national bank with the
name Wells Fargo Bank Southwest, National Association, effective November 1, 2009. This is
also the official certification to merge Wells Fargo Bank Southwest, National Association with
and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota, effective
November 1, 2009.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by email at:
Stephen.Lybarger@occ.treas.gov . Please reference the application control number or numbers
in any correspondence.

Sincerely,

Stephen A. Lybarger

Stephen A. Lybarger
Large Bank Licensing Lead Expert

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In Re:    Kyra Isabel Nelson                    Chapter: 13
          Debtor,                               Case No: 24−41202
                                                Judge Elizabeth D. Katz

## NOTICE OF FILING OF TRANSCRIPT
## AND OF DEADLINES RELATED TO RESTRICTION, REDACTION AND RELEASE

**Notice is hereby given** that an official transcript has been filed in the above referenced case. The following deadlines for restriction, redaction and release of the transcript apply:

1. The parties have twenty−one (21) calendar days from the date of filing of the transcript to file a *Request for Redaction* with the court and a Certificate of Service stating that the request was served on the other parties to the case and on the transcriber. **Please contact the court's Electronic Court Recorder Operator for the name and address of the transcriber**.

   The attorney or pro se party filing a *Request for Redaction* must attach a list of information to be redacted with the request. The information should be identified by type of identifier (e.g., minor's name, birth date, etc) with page and line number where the information appears in the transcript. Redaction requires that only the last four(4) digits of an individual's social security number or the last four(4) digits of a financial account number be shown; only a minor's initials, not his/her name, should be shown; and for birth dates only the year of birth should be shown. Specificity will reduce errors. **Please note: The Request for Redaction is a public document − do not include the actual identifiers in the Request or the attached list.**

2. If a *Request for Redaction* is filed, the redacted transcript is due 31 calendar days from the date of filing of the transcript.

3. If no *Request for Redaction* is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 90 calendar days from the date of filing of the transcript unless extended by court order.

   To review the transcript for redaction purposes, you may view the transcript at no cost from any public terminal in the Clerk's office. The document may not be printed from these terminals until the 90 day restriction period has elapsed. You may also purchase a copy of the transcript from the transcriber at the rate established by the Judicial Conference.

   ECF Users who purchase the transcript may also be given remote access to the transcript through the Court's ECF system. Subsequent to the purchase, the transcriber will contact the Court so that the ECF Users' access may be activated. **Please note: Remote access is not the same as purchasing the transcript. Remote access is not free; PACER charges will apply. The 30 page cap does NOT apply to transcripts. The full per page price will be charged to the ECF Users' PACER statement.**

Date:1/31/25                               By the Court,


                                           Mary P. Sharon
                                           Clerk, U.S. Bankruptcy Court

39

Kyra I. Nelson
65 Lovers Lane
Groton, MA 01450
kyra.nelson5@gmail.com
(617) 821-2341

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS (WORESTER)

| In re | | Chapter 13 |
| Kyra I. Nelson | | Case #24-41202 |
| Debtor. | | |

**DEBTOR'S RESPONSE AND OBJECTION TO WELLS FARGO BANK, N.A. AND/OR SUCCESSORS AND ASSIGNS FOR ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND FOR *IN REM* RELIEF**

<u>**INTRODUCTION**</u>

COMES NOW Plaintiff KYRA NELSON and files this **DEBTOR'S RESPONSE** AND OBJECTION TO WELLS FARGO BANK, N.A. AND/OR SUCCESSORS AND ASSIGNS (seemingly the same Party that has been filing previously) FOR ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY AND FOR *IN REM* RELIEF and hereby moves this Honorable Court pursuant to MLBR 13-16-1(a) and the requirement of MLBR 4001-1(a) and (b), and paragraph (a) and (b) of this Rule, a motion for relief from stay with respect to real property located at 65 Lovers Lane, Groton, MA 01450 (the "Property") shall be accompanied by MLBR Official Local Form 13, entitled Motion for Relief from Stay - Real Estate Worksheet (the "Worksheet"). For non-compliance with procedural rules, the Court should deny this motion for relief from stay pertaining to real estate. This is a very simple request for lift of stay and is not special or complicated, as counsel would misrepresent to this Court.

1

In support thereof, and in compliance with United States Bankruptcy Court, District of Massachusetts Local Rule 4001-1, Debtor states as follows:

The debt is discharged, Kyra Nelson does not owe this debt to Wells Fargo, and Wells Fargo has no perfected lien that can be protected by this court and currently a Proof of Claim that is objected to and carries no prima facie evidence.

The property of Kyra Nelson is very important to the bankruptcy estate. For the bankruptcy to be successful, Debtor and her creditors have a right to have the property stay in the jurisdiction of the bankruptcy court. Debtor Kyra Nelson's has two secured creditor's in her plan that are entitled to have the property remain in the estate and protect the rights of her secured creditors with their pre-petition perfected liens which is the very reason her Primer Residence property must remain in the protection of the bankruptcy court's jurisdiction during the pendency of this bankruptcy.

**HOMESTEAD EXEMPTION BARS WELLS FARGO'S REQUEST TO LIFT STAY**

**FOR A NON-JUDICIAL FORECLOSURE**

The Debtor has claimed state homestead exemption. The Massachusetts Supreme Judicial Court has interpreted the Massachusetts Homestead Statute as barring claims for non-judicial sales. See, e.g., *Garran v. SMS Fin. V, LLC* (In re Garran), 338 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Declared Homestead Exemption: This exemption requires the homeowner to file a written declaration of homestead with the registry of deeds. This has been filed by Debtor. It

2

provides a higher level of protection, exempting up to $500,000 in equity in the

home from creditor claims (M.G.L.A. 188 §1), (M.G.L.A. 188 §3).

Wells Fargo is seeking to lift the stay against the Debtor in order to

seek a non-judicial sale. As that is not permitted, it has not presented any facts

to justify this court lifting the stay. See *In re Zakarian*, 570 B.R. at 686 (explaining

that "despite misstating the nature of ownership of the . . . property [the

declaration] correctly identifies the debtor as an owner"); In re Newcomb, 513

B.R. at 15 (notwithstanding certain inaccurate information in a declaration of

homestead, determining that "[o]n its face, the Declaration satisfies all the

requirements of Mass. Gen. Laws ch. 188, § 5(a)" and the inaccuracy as to the

derivation of the ownership interest, which is not explicitly required by the statute,

would be determined as immaterial by the Supreme Judicial Court).

The Massachusetts Supreme Judicial Court has described the policy

underlying the homestead exemption:

> Homestead laws are based on a public policy which recognizes
> the value of securing to householders a home for the family
> regardless of the householder's financial condition. The preser-
> vation of the home is of paramount importance because there
> the family may be sheltered and preserved. Public policy
> dictates that exemption laws, such as homestead provisions,
> should be liberally construed to comport with their beneficent
> spirit of protecting the family home.

*Dwyer v. Cempellin*, 673 N.E.2d 863, 866 (Mass. 1996) (citation and internal

quotations omitted). The Massachusetts homestead exemption is to be liberally

construed in favor of the declarant. Id. (citations omitted). However, "liberal

construction does not mean that courts can extend the protection of the

homestead exemption when doing so would contradict the 'plain and

3

unambiguous' language of the statute." *In re Garran*, 338 F.3d at 6 (citation

omitted). The plain language of the Massachusetts Homestead Act must be

examined. "Any doubts as to the extent of the homestead estate must be

resolved in favor of the debtor in order to comport with public policy as explicated

by the Massachusetts Supreme Judicial Court." *In re Vaghini*, 549 B.R. 546, 549

(Bankr. D. Mass. 2016) (citing *Dwyer v. Cempellin*, 673 N.E.2d at 866).

11 U.S.C. §502(b)(l) disallows claims against the debtor that would be

unenforceable against the debtor under an agreement or applicable law at the

time of the bankruptcy petition. This section disallows claims that would not be

enforceable if the bankruptcy had not been filed. As the debt was discharged,

Kyra Nelson does not owe this debt to Wells Fargo, and Wells Fargo has no

perfected lien that can be protected by this court.

## <u>NO DEBT INSTRUMENT OR MORTGAGE</u>

Wells Fargo's Proof of Claim does not contain a Debt Instrument or a

Mortgage in violation of B.R. 3001 (d) **Evidence of Perfection of Security**

**Interest**. If a security interest in property of the debtor is claimed, the proof of

claim shall be accompanied by evidence that the security interest has been

perfected.  However, Wells Fargo loses its prima facie evidence of validity for the

claim without this evidence that Kyra Nelson owes a debt, loses its claim on the

amount of the debt owed by Kyra Nelson pursuant to its lack of evidence

according to B. R. 3001 (f) losing its evidentiary effect.  Therefore, the missing

documentation confirms that Wells Fargo is not a creditor and a lift of stay

pursuant to its Proof of Claim is merely a non-creditor.  The POC lacks prima

facia evidence and is therefore no longer presumed to be valid (see *In re Brunson,* 486 B.R. 759 (2013)) and does not have evidence of its so called "in rem" rights of an unperfected unrecorded lien. In fact, this claim can be disallowed when it has been objected to *In re Reynolds*, 470 B.R. 138 (2012).

The failure of Wells Fargo's proof of claim to include a note or mortgage, much less a perfected security interest renders it defective and cannot form the basis of a secured claim. By filing a claim against the estate, Wells Fargo triggers the process of allowance and disallowance of claims and an objection or an adversary proceeding, soon to be filed, is seeking recovery against the creditor which becomes part of that claims allowance process, see *In re Cruisephone, Inc.,* 278 B.R. 325,330 (Bankr. E.D.N.Y (2002).  Debtor has objected to the Proof of Claim and the capacity of Wells Fargo to be included in this Chapter 13 case as Wells Fargo has no claim for the debt and as the secured creditor, by operation of law, is Wells Fargo South Central, N.A. successor by merger to Wells Fargo South, N.A. successor by merger to World Savings Bank, FSB, and Debtor has included protection payments for this pre-petition perfected lien holder in her Plan.

## **WELLS FARGO IS NOT ENTITLED TO EXTRA RIGHTS**

Wells Fargo does not deserve more rights and more attention than the properly pre-petition perfected interest of the secured creditors in the Plan. Bankruptcy courts do not allow for preferential treatment of one creditor over another.

Wells Fargo's act of filing a proof of claim constitutes consent to the jurisdiction of the bankruptcy court to adjudicate both 1) Matter pertaining to the claim itself and 2) related matters, including claims by the debtor against the creditor.  This allows Kyra Nelson to secure her assets under bankruptcy protection while disputes of creditors and claims are settled.

## NO BASIS FOR A LIFT OF STAY EXISTS

Wells Fargo has no claim that needs a lift of stay or a perfected lien to put into a protection plan without the lawful required steps to create a perfected lien to protect and Wells Fargo is without a claim of a debt. Already discharged and over the statute of limitations for collection, there exists no enforceable debt that is associated with the lien which is a requirement for enforcement of a lien in Massachusetts.

 The Loan Agreement and the lien are no longer connected which is common in Massachusetts when the debt does not follow the lien. When the debt does not follow the lien, there is no "in rem" action to enforce. Case Law on Assignments: The case of  *U.S. Bank Nat. Ass'n v. Ibanez,* 458 Mass. 637 (2011)) clarifies that in the absence of a valid written assignment of a mortgage the mortgage holder remains unchanged.  The mortgage holder in this case is World Savings Bank.   Similarly, i*n Eaton v. Federal Nat. Mortg. Ass'n*, 467 Mass. 160 (2014) it was held that a mortgage and the underlying note can be split. In the case of *Balch v. Onion*, 58 Mass. 559 (1849) it was ruled that when the transfer of a negotiable note is without a date, the presumption is that the transfer was made around the time or soon after the note was made.  However, it was

sometime after 2014 that Wells Fargo created an anomalous note which indicates an unlawful modification of the Loan Agreement voiding the ability to use it for enforcement.

An interesting fact in this matter is that in the previous bankruptcy of the actual borrower (a non-party hereto), Wells Fargo presented very different documents in the response to litigation brought by Mr. Nelson.  In this action, Wells Fargo filed a Loan Agreement claiming that it is the "original note".  The first action included an unindorsed Pick-A-Payment agreement while this action has an anomalous  indorsement on the Pick-a-Payment agreement and is quoted as being the "original Note."  These are not copies of the same note at different stages, as Wells Fargo did not acquire the documents at different stages, they are different Pick-a-payment agreements.  This is also true of the mortgage filed in the original case.  It is a different mortgage.

## **WELLS FARGO NOT LISTED AS A CREDITOR**

 In the Chapter 7 bankruptcy of 2012, Wells Fargo was not named as a creditor, did not file a proof of claim and had no secured lien on the property at the time of the Chapter 7 bankruptcy.  Making a claim of a "ride through" in the chapter 7 bankruptcy is a fraudulent representation of the facts. This behavior is governed by judicial estoppel and Wells Fargo's entire motion should be stricken[1].

_____

[1] See Wells Fargo scandals: The complete list, wells-fargo | Violation Tracker, Timeline: Wells Fargo's Biggest Legal Settlements, 2.pdf (SECURED), Timeline of the Wells Fargo Accounts Scandal - ABC News, A timelineEvery Wells Fargo consumer scandal since 2015:, etc.  This

7

## NO PERFECTED LIEN

This is a very simple case.  There is nothing unusual about a request for a
lift of stay except for the fact that Wells Fargo has no perfected lien on the
property located at 65 Lovers Lane, Groton, MA 01450 (the "Property"), while
Wells Fargo South Central has a legitimate claim.  Wells Fargo has no
enforceable  debt for which the sale of the property will fulfill an obligation of a
debt, a requirement to foreclosure.  All of the documents in their proof of claim
are for another bank and a different debtor and not in favor of Wells Fargo.  And
none of the agreements are not in the name of the Debtor in this bankruptcy.
Wells Fargo has no court order directing the Registrar of Deeds to modify the lien
in the name of Wells Fargo.  The debt loan agreement and mortgage is not with
the  owner by the property.  Wells Fargo's lift of stay is not applicable for Relief
pursuant to Section 362(d) of the United States Bankruptcy code, they are not
entitled to relief pursuant to 11 U.S.C. § 362(c) and § 362(d), and Fed. R. Bankr.
P. 4001, as they are not a creditor of Kyra I. Nelson (hereinafter "Debtor"), Wells

---

entity has a long history of proven fraud.  See also Barone v. Wells Fargo Bank, N.A., No. 18-
783, Supreme Court of the United States, 20190321123735256_00000001.pdf.
1  https://finance.yahoo.com/news/wells-fargo-scandals-the-complete-timeline-
141213414.html?guccounter=1&guce_referrer=
aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAANAb-u1-
faQy6upRPUa9b7fQwiTOfDe462mfV9XBJNUUpIUgaSGcIFpVmCdM1yfht0yUaS
tfaq9ogitlfCxzjBQVMMwDkBvnK02CRy77hdIGSGq3U2cAyMf81cGuwdRfJFr_5g
DDX7MoEOVCXYWafoyhfXeXWIsLY8jO27TLqCSF

2  https://violationtracker.goodjobsfirst.org/parent/wells-fargo
3  https://www.investopedia.com/wells-fargo-timeline-7498799
4  https://abcnews.go.com/Business/timeline-wells-fargo-accounts-
scandal/story?id=42231128
5  https://crsreports.congress.gov/product/pdf/IF/IF11129/2

Fargo has no contract with  Kyra Nelson entitling Wells Fargo to enforce a

payment obligation, nor a perfected lien on the property allowing them any relief

to enforce a lien that is not in existence per the strict recordation laws in the State

of Massachusetts.

Nor is Wells Fargo allowed protection of unperfected unrecorded lien.

Wells Fargo Bank, N.A. has no claim *in rem* against Kyra Nelson's property

which has no perfected lien of Wells Fargo, and a protected lien by Wells Fargo

South Central, NA.  Kyra Nelson is not a borrower to Wells Fargo and there is no

debt to match up with the lien.  Debtor's ownership of the property as a bona fide

purchaser did not transfer an obligation to pay another party's debts and has no

contractual terms and conditions of the Mortgage having no relationship to the

documents or debts of another borrower which are the only papers presented by

Wells Fargo, all presented papers are the debts owed to World Savings Bank,

FSB by someone other than the Debtor.  Wells Fargo's debt instrument contains

absolute evidence that the instrument has been indorsed to another party that

remains unidentified at this time.  An indorsement is used only for the purpose to

transfer the rights from the note holder to the party that negotiated the transfer.

Debt instruments are not indorsed to the note holder by the note holder as Wells

Fargo is asking this court to believe. This indorsement does not identify the bank

where Georgiana M, Sielini is the Vice President Loan Documentation or who

has provided her title. *If this is a fraudulent indorsement it voids the debt and the*

*mortgage that goes with it.* An anomalous indorsement means an indorsement

made by a person who is not the holder of the instrument.

## RES JUDICATA

Wells Fargo's request for further ruling from this bankruptcy court is *res judicata* as Massachusetts courts recognize that a bankruptcy discharge under 11 U.S.C. § 524(a) precludes creditors from pursuing discharged debts in personam and that such discharges can have *res judicata* effects, preventing creditors from relitigating issues related to the discharge in other proceedings.  In *Way v. Howe*, 108 Mass. 502 (1871) the court ruled that a discharge in bankruptcy releases the bankrupt from all debts that could have been proved against the estate in bankruptcy and can be pleaded as a full and complete discharge to all suits brought thereon.

## COUNSEL SIGNED THE PROOF OF CLAIM

The signatory to the proof of claim, whether that is an attorney or an authorized signatory for the creditor itself,  should take particular care in executing a proof of claim to ensure that all information is accurate and that counsel is capable of explaining the factual basis of the claim.  For instance, the POC claims that "the property owes taxes and insurance" that was the **personal (in personam) liability** of the <u>insured borrower</u> and the **personal tax of property owner (in personam)**, and this is not possible in a discharged debt of **personal (in personam) liability**.  This constitutes a fraudulent claim.

## TIMELINE OF FACTS  (See Plaintiff's Exhibit A)

# 65 Lovers Lane, Groton, MA

| Date | Property Owner | Event | Note holder | Obligor to debt | Perfected Lien Holder |
|---|---|---|---|---|---|
| 2000 | Wells Fargo Home Home Mort, Inc | Acquired and remains | | | |

|  |  | Private |  |  |  |
|---|---|---|---|---|---|
| 3/2/2007 | Bradley Nelson | Nonnegotiable Pick-A-Payment Loan  $511,500 | World Savings Bank | Bradley Nelson | World Savings Bank |
| 10/31/2009 | Bradley Nelson | World Savings becomes Wells Fargo Bank South becomes | Wells Fargo Bank South Wells Fargo Bank South Central | | Wells Fargo Bank South Wells Fargo Bank South to |
| 11/1/2009 | | | World Savings | | Wells Fargo Bank |
| 10/23/2012 | Bradley Nelson | Bankruptcy Discharge Chapter 7 | Bank n/k/a Wells Fargo Bank South No Claim-no ride through of lien | Discharged Wells - no claim no ride through | South Central no claim |
| 9/4/2014 | Bradley Nelson | Lawsuit filed against Wells Fargo | World Savings Bank n/k/a | no obligation to pay | Wells Fargo Bank South Central |
| 5/27/3017 | | Case dismissed for Failure to state a claim No rulings for Wells Fargo | World Savings Bank n/k/a | no obligation to pay | Wells Fargo Bank South Central |
| March of 2019 | Bradley Nelson | Bankruptcy Chapter 13 | World Savings Bank n/k/a | no obligation to pay | Wells Fargo Bank South Central |
| 5/10/2019 | Bradley Nelson | Appeal in Bankruptcy For Request for Evidentiary Hearing ONLY Request DENIED | World Savings Bank n/k/a World Savings Bank n/k/a | no obligation to pay no obligation to pay | Wells Fargo Bank South Central Wells Fargo Bank South Central |
| 12//28/2023 | Kyra Nelson | Property Sold | Wells Fargo South Central Bradley R. Nelson Lender | $499,000 | Wells Fargo Bank South Central Bradley R. Nelson |

End of Chart[2]

## DIRECT RESPONSE TO WELLS FARGO'S LIFT OF STAY

1.  *In Christakis v. D'Arc*, 471 Mass. 365 (2015) the court explained that a

---

[2] No lawsuits of Wells Fargo Bank, N.A. were omitted from this time line chart as no lawsuit against Mr. Nelson for the "in rem" judicial foreclosure action or any other complaint has ever been filed.

2. discharge in bankruptcy voids any judgment to the extent it determines the personal liability of the debtor for a discharged debt. The discharge operates as an injunction against any act to collect the debt as a personal liability of the debtor. This case highlights the distinction between in personam and in rem actions post-discharge. In this case, Wells Fargo is not entitled to enforce the Loan Agreement as the enforcement is no longer available by Statute of Limitations

3. In Goldman v. Adlman, 291 Mass. 492 (1935) the court addressed the issue of res judicata in the context of a bankruptcy discharge. The court found that the municipal court's adjudication of whether the creditor had notice of the debtor's bankruptcy, which would make the discharge a bar to the claim, was final and required the application of res judicata.

4. No Proof of Claim was filed in the Chapter 7 of the former owner, so no in rem ride through exists upon which any creditor could seek this court to grant a relief of stay since no in rem claims exist today. The law is clear that only those creditors that filed a proof of claim have the opportunity to seek an in rem recovery. Since no proof of claim was filed, no in rem claim remains.

5. Wells Fargo has filed no lawsuits or claims to perfect its purported interests as required by the Massachusetts recordation laws and has made no attempts to enforce its *in rem* rights that require recovery only by a judicial procedure.

6. The Trustee abandoned the property and did not provide a ride-through for Wells Fargo or World Savings as neither filed a proof of claim and neither made a claim in the Chapter 7 bankruptcy or objected to the Discharge. Wells Fargo did not proceed on any lawsuit against the property or against the borrower. As such, the **statute of limitations has run for the enforcement of the debt that might be remaining after the discharge.**

7. Wells Fargo did not merge with the lender to the former owner of the property herein. Attached hereto is the evidence from the federal regulators demonstrating that Wells Fargo's representations are a fraud on the court as it has never had any relationship with World Savings out of Texas regarding the prior owner's loan. In fact, World Savings Bank, is now known as Wells Fargo South Central at 2005 Taylor Street, Houston, Texas.

8. The World Savings Mortgage to the former owner of the property herein did not transfer to Debtor herein. The Mortgage contains the ONLY remedy available to World Savings, stated in paragraph 26 permitted World Savings to accelerate against the prior owner, which it elected not to do. No lien on the property was applicable to anyone purchasing the property.

9. The first paragraph of the motion is an attempt to avoid filing an affidavit that it is telling the truth; however, they are not telling the truth and should not be exempt for the failure to file an affidavit.

10. Wells Fargo is not the successor in interest to World Savings out of Texas. Defendant's Exhibit C does not have anything to do with the lender. (See Attached Plaintiff Exhibit B attached the true history of the lender now known as Wells Fargo South Central).  Wells Fargo is perpetuating a fraud on the court through misleading and deceptive records, as shown by the records pertaining to the lender.

11. There is no pre-petition arrearage relating to Debtor or the property. There is no arrearage because there is no debt that is due from the borrower, a non-party to this bankruptcy, and the **property is not a borrower** on the loan agreement.  The accounting on the debt STOPS after the borrower is discharged and no interest or monthly payments.  As for taxes or homeowner's insurance in the name of the borrower, these are **in personam debts** that are fully discharged and cannot accumulate against the "property".

12. In paragraph 10, Wells Fargo wrongfully states that it is the lienholder. There is no perfected lien for Wells Fargo. That is an untrue statement.

13. In paragraph 11, there is no obligation to Wells Fargo from Debtor.

14. In paragraph 14, Wells Fargo incorrectly states that there is an ongoing monthly mortgage payment.  The debt was discharged and no payments are due on a monthly basis as the "property" is not a borrower.  It does note that Sept. 1, 2012 was the date payments ceased.  This acknowledges that the statute of limitation has expired.  As such, the motion to lift the automatic stay is frivolous.

15.  As to paragraph 15, Wells Fargo supplied a letter noting that it was involved with a different World Savings entity and told the court that it was the lender.  This was untrue and is the basis of the fraud on the court that Wells Fargo continues to engage in. As its attorneys are now aware of the fraud on the court, their continued perpetration of the fraud on the court should result in their own investigation and contempt proceedings.

16.  In paragraph 16, Wells Fargo is attempting to prove its case based on mere argument of counsel and perpetration of fraud on the court.  See Plaintiff's Exhibit A and Exhibit B.

17.  Paragraph 16a is completely erroneous with every word and purported elements of history which are irrelevant to its failure to prove a debt or lien against Kyra Nelson.

18.  In Paragraph 16b, Wells Fargo had filed no pleadings to consider and was not in front of the court with relief as it had no complaint, and recovered nothing.

19.  In Wells Paragraphs 18 and19 refers to a nonexistent co-debtor to the Loan Agreement, and Mr. Nelson is not a party to this bankruptcy.

20.  In Paragraph 20 and 21 Wells Fargo has no debt to recover from Kyra Nelson any debt to be satisfied by a sale of her homestead property for which no lawful perfected lien of Wells Fargo has ever existed.

**THE PROPERTY IN QUESTION IS NECESSARY FOR AN EFFECTIVE REORGANIZATION**

11 U.S.C.A. § 362(d)(2), which allows a court to deny relief from the stay
as Debtor has demonstrated that the property is essential for a successful
reorganization and completion of the 36 month Plan (*In re Mayslake Village-
Plainfield Campus, Inc*., 441 B.R. 309 (2010).

Debtor's reorganization and ability to pay her debts requires the inclusion
of the property as necessary for an effective reorganization while Debtor gains
control of her financial situation and regains the ability to consistently pay the
obligations, including the obligations that will extend past the bankruptcy Plan
time.

Debtor has amended her Plan and Schedules to include all prepetition
secured and unsecured creditors and has made arrangements with the creditors
to agree to the Plan payments allowing for a reorganization with the current
agreements reached with the creditors, the plan is feasible and likely to be
confirmed.. In *In re Ripley,* the court emphasized that the debtor must show a
reasonable possibility of a successful reorganization within a reasonable time (*In
re Ripley*, 412 B.R. 690 (2008))

Adequate Protection for the secured creditor's in included in the Plan and
they are adequately protected. The property has sufficient equity to protect the
prepetition perfected lien creditor's interest and the debtor is making adequate
protection payments. In *In re Canty*, B.R. 273 (2024))the court found that the
creditor failed to demonstrate "cause" for relief from the automatic stay based on
lack of adequate protection.

By Wells Fargo's filing of its POC, the bankruptcy court has been given

jurisdiction already to have these exact issues heard and sorted out, it is prudent

for the jurisdiction over these issue to remain with the bankruptcy court and the

stay remain in place during the pendency of the outcome which is directly

affecting the Debtor's ability to complete her plan and payments to the real

perfected secured lien holders that are already addressed by this court. The

objections are now before this court and soon the adversary will also be in front

of this court.  For judicial economy, and for consistency in rulings it would be

prudent for the asset to be protected, the stay remain in place  (*In re Kadlubek

Family Revocable Living Trust,*  545 B.R. 660 (2016) the debtor argued that

controlling the sale of the property would yield a higher price, benefiting the

estate and reducing the deficiency owed to the secured creditor.

## CONCLUSION

The purported "in rem" claim of Wells Fargo does not allow for a non-

judicial foreclosure procedure pursuant to the statutory scheme of the non-

judicial procedure that must be followed pursuant to Massachusetts law.  Were

Wells Fargo to claim its "in rem" rights, it must be done in a court of law under

auspices of the trial court where the rights of the parties to litigation are protected

with discovery, depositions, motion practice and other legal requirements,

including a trial by jury.

By Wells Fargo's filing of its POC, the bankruptcy court has been given

jurisdiction already to have these exact issues heard and sorted out, it is prudent

for the jurisdiction over these issues to remain with the bankruptcy court and the

stay remain in place during the pendency of the outcome which is directly

affecting the Debtor's ability to complete her plan and payments to the real

perfected secured lien holders that are already addressed by this court. The

objections are now before this court and soon the adversary will also be in front

of this court.  For judicial economy, and for consistency in rulings it would be

prudent for the asset to be protected, the stay remain in place and the request of

Wells Fargo DENIED.

Wherefore, Kyra Nelson requests that the Lift of Stay by Wells Fargo

Bank, N.A.  And/Or Successors And Assigns For Order Granting Relief From The

Automatic Stay And For *In Rem* Relief  be DENIED.


Dated:  February 12, 2025                          Respectfully submitted,

                                                   */s/ Kyra I. Nelson*
                                                   Kyra I. Nelson
                                                   65 Lovers Lane
                                                   Groton, MA 01450
                                                   kyra.nelson5@gmail.com
                                                   (617) 821-2341


Exhibit A – Registrar of Deeds Middlesex County Recorded Perfected Liens
Exhibit B – Wells Fargo South Central, N.A. successor by merger to Wells Fargo
          South, N.A. successor by merger to World Savings Bank.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| In re | | Case No.  24-41202 |
| | | Chapter  13 |
| KYRA ISABEL NELSON | | |
| | | |
| Debtor | | . |

CERTIFICATE OF SERVICE

I, Kyra I. Nelson, hereby certify that on February 12, 2025, I electronically filed the foregoing Objection the Lift of Stay filed by Wells Fargo Bank, N.A. and filed with the Untied States Bankruptcy Court for the District of Massachusetts through the pro se filing system the foregoing documents to participants:

Richard King, Assistant U.S. Trustee

David Mawhinney, Trustee


I certify that I have mailed by first class mail, postage prepaid the documents electronically filed with the Court on February 11, 2025 to the following participants:

Marcus E. Pratt, Esquire
BBO #684610
Korde & Associates, P.C.
900 Chelmsford Street, Suite 3102
Lowell, MA 01851
Tel: (978) 256-1500
bankruptcy@kordeassociates.com


/s/ *Krya I. Nelson*
Kyra I. Nelson
65 Lovers Lane
Groton, MA 01450
kyra.nelson5@gmail.com
(617) 821-2341

# EXHIBIT

## A

 **PASSPORT** | **PROPERTY DETAILS REPORT**

## Subject Property Location

Report Date: 08/06/2024
Order ID: R156372318

| | | | |
|---|---|---|---|
| **Property Address** | 65 LOVERS LN | | |
| **City, State & Zip** | GROTON, MA 01450-1831 | | |
| **County** | MIDDLESEX COUNTY | **Property Use** | Single Family Residential |
| **Mailing Address** | 85 ORCHARD ST, BELMONT, MA 02478-3509 | **Parcel Number** | GROT M:115 B:30 L: |
| **Census Tract** | 3261.02 | **Latitude** | 42.601384 |
| **Thomas Bros Pg-Grid** | | **Longitude** | -71.558648 |

**Legal Description Details** Block: 30 District: 115 City, Municipality, Township: GROTON Brief Description: BLK:30 DIST:115 CITY:GROTON

## Current Ownership Information    *Source of Ownership data: Recorder Information*

| | | | |
|---|---|---|---|
| **Primary Owner Name(s)** | NELSON, KYRA I | **Sale Price** | |
| | | **Transfer Date** | 12/22/2023 |
| | | **Recording Date** | 12/26/2023 |
| **Vesting** | | **Recorder Doc #** | 146950 |
| | | **Book/Page** | 82344/531 |

## Property Characteristics

| | | | | | | |
|---|---|---|---|---|---|---|
| **Bedrooms** | 4 | **Year Built** | 1999 | **Living Area (SF)** | 2,697 |
| **Bathrooms/Partial** | 2/1 | **Garage/No. of Cars** | | **Price ($/SF)** | $111/SF |
| **Total Rooms** | 8 | **Stories/Floors** | 2 Stories w/ Basement | **Lot Size (SF/AC)** | 88,427/2.03 |
| **Construction Type** | Frame | **No. of Units** | | **Fireplace** | 1 Fireplace |
| **Exterior Walls** | Wood Siding | **No. of Buildings** | 1 | **Pool** | |
| **Roof Material/Type** | Asphalt/Gable | **Basement Type/Area** | Unfinished Basement | **Heat Type** | Hot Water |
| **Foundation Type** | | **Style** | Colonial | **A/C** | |
| **Property Type** | Residential | **View** | | **Elevator** | |
| **Land Use** | Single Family Residential | | | **Zoning** | RA |

## Assessment & Taxes

| | | | | | |
|---|---|---|---|---|---|
| **Assessment Year** | 2024 | **Tax Year** | 2024 | **Tax Exemption** | |
| **Total Assessed Value** | $754,000 | **Tax Amount** | $11,378.00 | **Tax Rate Area** | |
| **Land Value** | $233,600 | **Tax Account ID** | 3221 | | |
| **Improvement Value** | $520,400 | **Tax Status** | | | |
| **Improvement Ratio** | 69.02% | **Delinquent Tax Year** | | | |
| **Total Value** | | | | **Market Improvement Value** | |
| **Market Land Value** | | | | **Market Value Year** | |

## Lien History

| Trans. ID | Recording Date | Lender | Amount | Purchase Money |
|---|---|---|---|---|
| 1 | 12/26/2023 | BRDLEY R NELSON | $499,000 | YES |
| 2 | 03/12/2007 | WORLD SAVINGS BANK FSB | $511,500 | NO |
| 3 | 03/12/2007 | WORLD SAVINGS BANK FSB | $102,300 | NO |
| 4 | 07/28/2006 | DECISION ONE MORTGAGE | $600,000 | NO |
| 5 | 12/28/2005 | OPTION ONE MORTGAGE CORP | $540,000 | NO |
| 6 | 05/10/2002 | HOMECOMING FINCL | $220,000 | NO |
| 7 | 09/14/2000 | FLEET MORTGAGE | $50,000 | NO |
| 8 | 12/11/1998 | US TRUST MIDDLESEX | $240,000 | YES |

## Loan Officer Insights

No details available

# EXHIBIT

## B

Home  >  Resources  >  Data Tools  >  BankFind Suite  > Find Institutions by Name & Location

Help

 BankFind Suite Home      Back to Search Results

# Wells Fargo Bank South, National Association



## Institution Details

Data as of 09/11/2023



**Institution Closed**
Merged or acquired on 11/01/2009
without government assistance

**FDIC Cert #**
33966

**Established**
01/17/1995

**Bank Charter Class**
National Banks, member of the
Federal Reserve Systems (FRS)

**Primary Federal Regulator**
Comptroller of the Currency

**Main Office Address**
2005 Taylor Street
Houston, TX 77007

**Financial Information**
Create financial reports for this
institution

**Consumer Assistance**
HelpWithMyBank.gov

**Contact the FDIC**
Questions about Bank Information

## Succeeding Institution

### Wells Fargo Bank South Central, National Association
### Cert - 5146



**FDIC Insured**
Since 01/01/1934

**Click to View Succeeding Institution**

See the succeeding institution for more information.

Get additional detailed information by selecting from the following:

| Locations | History | Institution Profile | Other Names |

**17 Historical Events**

Results
25 ▾

‹   1   ›

Page #

Go

| | Description of Event | View Details |
|---|---|---|
| 01/17/1995 | Institution established. Original name: World Savings Bank, SSB (33966). | ⓘ |
| 12/01/2000 | Changed Chartering Agency to OTS. | ⓘ |
| 12/01/2000 | Changed Bank Class to SB. | ⓘ |
| 12/01/2000 | Changed Primary Federal Regulatory Agency to OTS. | ⓘ |
| 12/01/2000 | Changed Institution Name to World Savings Bank, FSB (Texas). | ⓘ |
| 12/01/2000 | Changed Institution Name to World Savings Bank, FSB (Texas). | ⓘ |
| 12/01/2000 | Main Office moved to 2085 Westheimer Road, Houston, TX 77098. | ⓘ |
| 10/12/2007 | Main Office moved to 2005 Taylor Street, Houston, TX 77077. | ⓘ |
| 12/31/2007 | Changed Institution Name to Wachovia Bank, FSB. | ⓘ |
| 03/23/2009 | Main Office moved to 2005 Taylor Street, Houston, TX 77007. | ⓘ |
| 10/31/2009 | Institution becomes member of the Federal Reserve System. | ⓘ |
| 10/31/2009 | Changed Chartering Agency to OCC. | ⓘ |
| 10/31/2009 | Changed Bank Class to N. | ⓘ |
| 10/31/2009 | Changed Organization Type to COMMERCIAL BANK. | ⓘ |
| 10/31/2009 | Changed Primary Federal Regulatory Agency to OCC. | ⓘ |
| 10/31/2009 | Changed Institution Name to Wells Fargo Bank South, National Association. | ⓘ |
| 11/01/2009 | Merged and became part of Wells Fargo Bank South Central, National Association (5146) in Houston, TX. | ⓘ |

*Data prior to 01/01/2000 may include small anomalies which may or may not effect the historic events of this institution.
If you have questions or concerns, please contact the FDIC using the link above.

top of page

◄ | 1 | ►
Page #

| | Go |